

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

CENTRAL DIVISION

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

|  |  |  |
|---|---|---|
| JAMES ALLEN GREGG, | * | CR. 04-30068 |
|  | * | CIV. 07-3030 |
| Movant, | * |  |
|  | * | **REPORT and RECOMMENDATION** |
|  | * | **(Amended to Replace References to Full** |
| -vs- | * | **Names of Minor Children with Initials)** |
|  | * |  |
| UNITED STATES OF AMERICA, | * |  |
|  | * |  |
| Respondent. | * |  |
|  | * |  |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

James Allen Gregg filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc. 225). He is represented by retained counsel. The Government was directed to file a response to the § 2255 motion. Judge Kornmann referred the matter to the Magistrate Judge (Doc. 249). The parties requested an extended briefing period, which was granted. An evidentiary hearing was requested, and one was held on May 12, 2009. Petitioner was present with his counsel, Mike Butler, Michael Spence and Brent Gurney. The Government was represented by Assistant United States Attorney Mikal Hanson. For the reasons stated below, the Court respectfully recommends to the District Court that Petitioner's request for relief be granted.

## JURISDICTION

The pending matter was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Piersol's Standing Order dated November 29, 2006.

## PROCEDURAL HISTORY

On July 21, 2004, a grand jury indicted Gregg[1] for first degree murder of James Fallis, and for the use of a firearm during a crime of violence. After a jury trial in January, 2005, Gregg was convicted of second degree murder and use of a firearm during a crime of violence. Gregg filed a Motion for New trial pursuant to Rule 33 (Doc. 109). Judge Kornmann denied the motion (Doc. 178). Gregg also filed a Motion to Dismiss pursuant to Rule 12(b)(3)(B). Judge Kornmann denied the motion (Doc. 180). On September 30, 2005, Judge Kornmann sentenced Gregg to 135 months imprisonment on Count 1 and 120 months imprisonment on Count 2, with the terms of imprisonment to run consecutively (Doc. 204). Gregg appealed (Doc. 208) and the Eighth Circuit affirmed his conviction and sentence on July 27, 2006 (Doc. 220); *United States v. Gregg*, 451 F.3d 930 (8th Cir. 2006).

Gregg then timely filed for § 2255 relief, citing only one ground in support of his motion: ineffective assistance of counsel. Gregg asserts his trial counsel was ineffective for failing to recognize that the victim's prior specific acts of violence of which Gregg was aware at the time of the incident would have been admissible at trial under Fed. R. Evid. 404(b) to prove Gregg's state of mind for purposes of his self-defense argument, and that trial counsel's failure to attempt to introduce such evidence at trial was prejudicial. The Government resists Gregg's § 2255 motion on the merits.

---

[1]In this case, the defendant and the victim share the same first name (James). The witnesses at trial referred to both the victim and the defendant as "Jim" and "James." The victim had a twin brother (Jerrod Fallis) , and the defendant and defendant's cousin share the same last name. To spare confusion, James Gregg will be referred to as "Gregg" throughout this document. James Fallis will be referred to by his full name, his brother will be referred to as "Jerrod" and witnesses will generally be referred to by their first names after initial identification. Also, Pete Fallis's (the Fallis brothers' cousin's) nickname is "Bud." Francis Red Tomahawk's nickname is "Chaske." Because the witnesses referred to them by their nicknames, the nicknames are used in this document as well.

## FACTUAL BACKGROUND

### 1. Jury Trial

Thirty-five witnesses testified during the course of the two day jury trial. The testimony of those witnesses who provided evidence pertinent to the very narrow issue presented by the pending § 2255 motion is reviewed below:

#### A. James Gregg

Gregg was twenty-two years old at the time of the incident and twenty-three years old at the time of trial. TT 731.[2] He was born and raised in the Pierre, South Dakota area. *Id.* He grew up on a cattle ranch in an area near Pierre commonly referred to as "the Pocket." TT 731-32. He participated in sports as a child, and learned to shoot a rifle at age eight. TT 733. Gregg graduated from Harrold High School in 2000. TT 734. Gregg joined the National Guard in November, 1999, before he graduated from high school. TT 737. After graduation from high school, Gregg went to basic training for the Guard in September, 2000. TT 737. He finished basic training in December, 2000. Gregg purchased his first semi-automatic rifle when he returned from basic training. TT 738. He used it for coyote hunting. *Id.* Coyotes were a problem on the ranch, and Gregg kept a loaded rifle in his vehicle with him almost all the time. TT 739. Gregg and his cousin (Beau Gregg) often had contests to see who was the better shot. TT 740.

Gregg returned to the family farm and lived in his father's basement for the next two years after basic training while saving money to go to technical school. TT 741. Gregg had completed one semester of the diesel mechanic's program at Lake Area Technical College in Watertown, South Dakota, when his National Guard unit was mobilized on January 24, 2003 (TT 742) and sent to active duty in Iraq in April, 2003. TT 746. Gregg remained in Iraq for eleven months. TT 748.

---

[2]The Court has been provided with a copy of the transcript of the jury trial. The habeas evidentiary hearing has also been transcribed, and is on file as Doc. 271. References to the transcript of the jury trial will be by "TT" while references to the transcript of the evidentiary hearing will be by "HT." References to the sentencing transcript will be by "ST."

3

When Gregg returned from Iraq, he always made sure he had a loaded pistol in his vehicle with him. TT 761.

Gregg had been acquainted with the Fallis family, who were his neighbors, since he was in grade school. TR 735. He did not have trouble with them when he was growing up–they lived in the same area, approximately eight miles away. TT 736. Gregg became friends with Jake Big Eagle in middle school, and they became good friends in high school. TT 736. They remained close after high school. *Id.* Beau Gregg is a Gregg's cousin and a close friend. *Id.*

On the evening of July 3rd, 2004, Gregg went to a funeral early in the day and then helped his father with farm chores in the early evening. TT 766. After chores, Gregg took his jeep to his cousin Beau's house. *Id.* As was his usual practice, he threw his rifle in his jeep. TT 767. Beau and Gregg had a beer and discussed their 4th of July plans. *Id.* The two men drove to the nearby boat dock to look for their friends, but did not see anyone. *Id.* As they were leaving, they ran into Heidi Ogle, whom they knew from school. TT 768. They invited her to come along with them, and the threesome went to DeGrey's Goose Camp Pit Stop. *Id.* Because it was getting cold, they exchanged Gregg's jeep for Beau's pickup truck. *Id.* They talked and drank beer at the Pit Stop for about an hour. TT 769.

After Gregg, Beau and Heidi had been at the Pit Stop for about an hour, James Fallis and his twin brother Jerrod arrived, along with Pete Fallis and an individual known as "one-armed Chris." TT 769. Gregg testified that up to that point he had "always gotten along great" with James Fallis and considered himself a friend, although he had never been over to James Fallis's house and James Fallis had never been to his house. TT 769-70. Gregg considered him an acquaintance and knew James Fallis from school and seeing him around town. TT 770. Gregg wanted to stay on James Fallis's good side. *Id.*

When Gregg first saw James Fallis on the evening of July 3rd at the Pit Stop, there was no animosity between the two men. TT 771. They greeted each other and James Fallis welcomed

4

Gregg back home. *Id.* The Fallises did not stay long; they came in, grabbed some beer and left. *Id.* Gregg, Beau and Heidi stayed at the Pit Stop until it closed at about 11:30 p.m. TT 771-72. At that time, the Fallis brothers returned to get more beer. TT 772. Gregg's party went outside to look at James Fallis's car, and the owner of the Pit Stop closed up when everyone went outside. *Id.* The Fallises said they were going to go party at the Guy St. John trailer in the Big Bend Housing area, but the Gregg party headed toward Beau Gregg's house. TT 772. Beau decided to stop at Guy St. John's trailer, but the group only stayed for about five minutes. TT 773. Then the Gregg party went to Beau Gregg's residence, which is located on the Bowers mint farm. TT 774. Jake Big Eagle (Beau's roommate at the mint farm) arrived. TT 774-75. Gregg, Beau and Heidi climbed the elevator and encountered racoons, which Gregg and Beau decided to try to shoot with their rifle and shotgun. TT 775. Eventually the Fallis brothers (James and Jerrod) arrived at the mint farm, along with several other people. TT 776.

As soon as the second group of people arrived, Pete Fallis ("Bud") wanted to fight with Beau Gregg. TT 777. James Fallis was Bud's back up. *Id.* Chaske wanted to fight with Gregg. *Id.* Gregg had never met Chaske until earlier that same evening at the Pit Stop. *Id.* After Chaske "egged on" Gregg a bit and Gregg refused to fight, Chaske shook Gregg's hand and said he was "just testing" Gregg. TT 778. Eventually, Beau left in his pickup. *Id.*

At one point during the gathering at the mint farm, Pete ("Bud") asked Gregg about his gun. TT 778. Bud said Jerrod Fallis wanted to see it, so Gregg retrieved the gun out of Jake's pickup. *Id.* Jerrod tried to shoot the gun, but the safety was on. TT 779. Eventually Gregg began talking with Chris, Bud and Jake, while Heidi went and sat in James Fallis's car with Jerrod Fallis. TT 779-80. Gregg testified that he wanted " a little bit" to go out with Heidi, but he was not jealous that she was sitting in the car with Jerrod. TT 780.

Gregg left the party in his jeep. TT 781. He was worried about Beau, because Beau left earlier and had not returned. *Id.* Gregg also wanted to waste a little time until Heidi was ready to leave. TT 782. It was beginning to get cold, so Gregg took his jeep home and got his own pickup.

5

*Id.* He threw his rifle from the jeep into his own pickup and went back to the party and got Jake. *Id.* Gregg did not want to leave the rifle in the open jeep. *Id.*

Gregg returned to the party at the mint farm and asked for Jake. TT 783. Jake got in the truck and the two of them left to look for Beau. *Id.* They drove around the Pocket, but did not find Beau. Jake and Gregg talked about Heidi, the war, and music while they drove. TT 784. Gregg was angry that Heidi had earlier said she wanted to leave, but then changed her mind. *Id.* Gregg and Jake were driving on Joe Creek Road when they saw Pete's truck heading toward the mint farm. *Id.* Gregg met Pete's truck and the two stopped to visit. Pete thought Gregg wanted to fight, but Gregg assured Pete he did not want to fight. TT 785. They began to discuss 4th of July plans, and Pete noticed he no longer had his cooler. TT 785. Pete decided to return to the mint farm to retrieve it. *Id.* Gregg decided to return to the mint farm as well. *Id.*

Gregg returned to the mint farm, and Jake retrieved his own pickup truck after they stopped other party participants from driving it out of the driveway. TT 785-86. Gregg waited for Jake to return, and Jake came back in his own pickup in just a few minutes. TT 786. Jerrod and James Fallis approached in James's car. TT 787-788. Jake and Jerrod began to argue. TT 788. Gregg heard them arguing about whether Gregg had thrown rocks onto James's car. *Id.* They went to look, but Gregg did not see any damage to James's car. *Id.* Gregg apologized and said if he threw rocks onto the car it was unintentional and he offered to pay for any damage. *Id.* Jake and Jerrod continued to argue, but Gregg returned to Jake's pickup. *Id.* As he did so, Gregg got punched in the right side of his face and knocked to the ground. TT 789. Gregg agreed this was a "sucker punch." TT 837. He got punched again before he could get up. *Id.* When Gregg stood up, he got punched again. *Id.* He could not tell who was punching him. TT 790. He indicated he did not want to fight. *Id.* The next thing he remembers is sitting in his truck with this head on the steering wheel with Jake next to him. TT 791. Gregg was upset that he went to fight for his friends, but when he came back his friends turned on him. Gregg's right eye was swollen to the extent he could hardly see out of it. It felt like his jaw was dislocated. Blood was running out of his eye. He was spitting blood from the cuts on his lips and mouth. TT 792. He felt a sharp headache and a throbbing ear. TT 792.

6

Gregg asked Jake why Jake did not stand up for him. *Id.* Jake seemed upset by the question. TT 791. Jake said "if you didn't think I stood up for you then I'll go stand up for you now." Jake left in his own pickup. TT 792.

Gregg wanted to be alone. TT 793. He drove toward a bluff that overlooks the river. *Id.* He was in pain and felt depressed. TT 794. He took his rifle from his truck and threw it over the hill, because it reminded him of the guns in Iraq. TT 796. He walked back to his truck and thought of Jake. TT 797. He remembered Jake said he was going to stand up for him, so he thought Jake was going to get into a fight. *Id.* Gregg went to look for Jake because he was afraid Jake was going to get into a fight with the Fallises or Chaske. TT 797-98. First he went to Bob Hattum's place, because that is where Bud Fallis lives. TT 798. He did not see Jake's pickup there, so he went to the West Bend Housing (Guy St. John's trailer) where they had been earlier that evening. TT 798-99. By this time it was 4:00 or 5:00 in the morning. TT 853. Jake's pickup was not there, but James Fallis's car was. TT 799. Gregg decided to apologize to James Fallis for anything he'd done and to try to figure out what had happened earlier. TT 799-800. Gregg did not want any trouble between his family and the Fallis family. TT 800. Gregg did not want any trouble in the Pocket area, and did not want Jake Big Eagle to be seen as a traitor for standing up for him. TT 800-801. He figured that James Fallis might have settled down by then, or that he could figure out if he had damaged James's car. TT 883. He wanted to make sure there were no hard feelings, because he did not want to have to watch his back all the time and he did not want James Fallis to take revenge on his parents or their ranch. TT 883. He thought if he talked to James and apologized he would be able to sleep better at night knowing they were friends again and everything was back to normal. *Id.*

Gregg pulled up next to James Fallis's car and parked. TT 801. James Fallis came out of the trailer, tore off his coat, and yelled, "you want more of this, motherfu**er?" James Fallis came to Gregg's truck door and pulled it open and tried to pull Gregg out of the vehicle. TT 801-02. Gregg held onto the steering wheel and pulled the truck door shut. TT 802. James Fallis stumbled back. Gregg grabbed his pistol. *Id.* He felt too weak to fight and believed he could not let James

7

Fallis get him out of the pickup. *Id.* Gregg could hardly see or speak. *Id.* Gregg was afraid James Fallis would beat him unconscious again, and that he might never wake up. TT 803. As James Fallis approached the truck again, Gregg pointed the pistol at him and asked him to get back. *Id.* James Fallis backed up two feet and yelled, "you want to fu** with guns? I got guns." James Fallis turned and ran toward the trunk of his own car. TT 803. Gregg thought James Fallis was going to get a gun. *Id.* Gregg knew James Fallis had guns because everyone in the Pocket hunts and has guns. TT 804. Gregg could see the reflection of people around his vehicle. TT 862. He did not want to run into them. *Id.* Leaving in his vehicle did not seem like an option at the time. TT 873. Gregg shot to stop James Fallis. TT 804. Gregg testified that he did not believe there was any escape. TT 865. He explained that James Fallis would have come after him. TT 866. Gregg cannot remember how many times he shot. TT 804. Gregg could not see out of his right eye, but out of his left eye as he was starting to shoot he could see James Fallis getting to the trunk of his car. Then Gregg could see James Fallis head toward the house. James Fallis was running the whole time, and Gregg thought he was missing. The more Gregg shot, the more he knew James Fallis would be coming back at him. TT 804. James Fallis got into the house and Gregg decided he had to get out of the area. *Id.* Gregg ducked down as he drove away, because he expected James Fallis to be firing at him at any moment. TT 806.

Gregg drove to a spot where he could see his parents' house so he could see whether James Fallis went to their house. *Id.* He waited until daylight. *Id.* Eventually Gregg talked to Jake on the phone, and Jake told him that James Fallis was dead. *Id.* Gregg thought he might have killed James Fallis, because James Fallis never came after him. TT 807. After Gregg talked to Jake on the phone, he drove down to the river and contemplated suicide. TT 807. Shortly thereafter the SWAT team arrived. TT 808. When the Sheriff arrived, Gregg told him that all James Fallis wanted to do was "fu**ing fight." TT 880. Eventually Gregg surrendered and was arrested for the murder of James Fallis.

## B. Todd Cowan

Todd Cowan has owned or been involved with a ranch in the Pocket since 1974. TT 889. He knew James Fallis. *Id.* He was familiar with James Fallis's reputation for aggression and violence. *Id.* Cowan explained that James Fallis "could be violent." TT 891. Cowan admitted that young boys who grew up in the Pocket had been in fistfights and he had been in a fistfight or two himself. TT 892.

## C. Jacob Big Eagle

Jacob Big Eagle lives on the Bowers mint farm in the West Bend area of the Pocket. TT 415. His roommate is Beau Gregg. TT 416. He went to school with James Gregg. James Gregg's family is one of the closest neighbors to the mint farm. TT 417. Jacob Big Eagle is good friends with James Gregg–in fact James Gregg is one of his best friends. *Id.* Jacob Big Eagle also went to school with James and Jerrod Fallis. *Id.* He got along with James Fallis and considered him a friend. TT 418. He considered Brent Sazue a friend and got along with him. *Id.* He also considered Pete ("Bud") Fallis a friend. *Id.* He had worked with Pete and had socialized with him. *Id.*

Jake went to Pierre on July 3rd, 2004. He first encountered the group of people involved in this incident when they had gathered at the mint farm. TT 420. He was in the house and saw all the cars drive by. Beau Gregg hollered for Jake to bring his shotgun because there were racoons in the grain bins. TT 421. Jake drove his pickup down to the grain bins. *Id.* Then three more vehicles arrived (James Fallis, Brent Sazue, and Pete "Bud" Fallis along with their various passengers). TT 424. Jake noticed Heidi sitting in a car with Jerrod Fallis. TT 425. Then Gregg left in his jeep. *Id.* When Gregg returned, he was in his pickup. TT 426. Shortly after Gregg returned, Jake left with Gregg. TT 427. Heidi remained in James Fallis's car with Jerrod. *Id.* Jake said Gregg "spun out" when they left, and they drove around the Pocket. TT 428. They talked about Heidi during the drive. TT 429. They drove around for about twenty minutes or a half an hour. TT 430.

9

Upon their return to the mint farm, Gregg and Jake met Pete "Bud" Fallis in his truck. TT 431. Bud was worried about the location of his cooler. TT 432. Jake recalls seeing Gregg's rifle in the pickup that evening, but he does not recall seeing Gregg's pistol. TT 433-34.

On their way back into the mint farm, Jake saw his pickup truck being driven out and he told Gregg to stop the truck. TT 443. Jake remembered he had earlier given permission to Chris to take the truck, but upon closer inspection, James Fallis and Francis Red Tomahawk ("Chaske") were in the truck. TT 444. They stopped, and Jake told James Fallis to slide over and let him drive them home. *Id.* Jake started down the road, but did not get far before he hit a deer. TT 446. They turned around and met back up with the other vehicles (including Gregg's) which were still parked on the road outside the mint farm. *Id.* When he returned, Jerrod Fallis also arrived in James Fallis's car. TT 447. Jerrod inquired why Gregg had spun gravel onto James Fallis's car. TT 447. Jake, Gregg, and the Fallis brothers looked at the front of James Fallis's car. TT 449. Jake did not see any damage. TT 503. James Fallis pushed Gregg and Gregg fell down. TT 450. Gregg said he did not want to fight. TT 503. Gregg got up, and Jake took Gregg to his own pickup and told him to leave. TT 450. Francis ("Chaske") came around and hit Gregg again. TT 451. Gregg told Chaske he did not want to fight but Chaske kept hitting him. *Id.* Jake went and talked to Jerrod. *Id.* Chaske was the first person to throw a punch. TT 452. Jake agreed that the Chaske's first punch was a "sucker punch." *Id.* Chaske also kicked Gregg while Gregg was on the ground. *Id.* Brent Sazue told Chaske to let Gregg get up and defend himself. TT 453.

Gregg got up and continued to tell Chaske he did not want to fight. TT 454. James Fallis approached and hit Gregg hard and knocked him out. *Id.* Then Chaske and James Fallis left in James Fallis's car. *Id.* Pete Fallis also left in his vehicle. *Id.* Jerrod and Brent picked Gregg up and put him in Jake's pickup. *Id.* When Gregg woke up, he walked to his own truck. TT 455. Brent and Jerrod walked back to their vehicle. Gregg got his rifle out of his pickup. TT 456. Jake took the gun from Gregg and put it in his own truck, and asked Jerrod and Brent to leave. TT 457. Gregg talked with Jerrod and Brent and then they left. TT 459. Gregg began to cry and asked why he got beat up and why Jake did not stick up for him. TT461. Jake told Gregg he would go talk to James

10

and Jerrod. TT 469. Jake did not want the Fallis twins mad at him. TT 498. It was important to make sure the Fallises did not stay mad at Gregg because Jake believed they could hurt Gregg. TT 499. The Fallis twins' reputation in the community for aggression and violence is that they do hurt people. That is what Jake was worried about when he went to try to defuse the situation. TT 501.

Jake left in his pickup, and assumed Gregg was going to go home. TT 472. Jake drove to the shop on the mint farm and got his car. TT 475. Gregg drove up to the shop as well and went to the cab of Jake's pickup. Jake did not see Gregg get into the cab, but the next morning, Gregg's rifle had been removed from Jake's pickup. Gregg left the mint farm. Jake put air in the tires of his car and filled it with gas. TT 475. He called the sheriff to come look at his damaged pickup truck. *Id.* The sheriff referred him to the Fort Thompson Police, who told him he would have to wait, because there had been a shooting. TT 476. The Fort Thompson Police told Jake about the shooting about fifteen or twenty minutes after Gregg left the mint farm. *Id.* Jake drove around the Pocket for about fifteen minutes. TT 495. When he walked in the door from driving around the pocket, his Aunt Mona called him and told him that James Fallis was dead. TT 495.

Gregg called Jake from Gregg's cell phone, and Jake told Gregg James Fallis was dead. *Id.* Gregg told Jake nobody stuck up for him. TT 484. Gregg did not say anything about having to shoot James Fallis because Fallis was going to get a gun. TT 529.

### D. Jerrod Fallis

Jerrod Fallis was James Fallis's twin brother. TT 599. He was with his brother on the evening of July 3, 2004. TT 601. He was not aware that there was a gun in his brother's car that night. *Id.* They stopped at the Pit Stop, and then went to the housing area to Guy St. John's trailer. TT 602. They saw Gregg at the Pit Stop. TT 603. They knew him from school and never had any problem with him. *Id.* Eventually they left the housing area and went to the mint farm. TT 604. While at the mint farm, Gregg pulled out a gun and showed it to him. TT 605. Jerrod tried to fire it but it would not fire. *Id.* Gregg was not angry, he was just showing Jerrod the gun. TT 606. Jerrod sat in his brother's car for twenty minutes or so with Heidi Ogle. TT 606-07. Later on in the

11

evening, Gregg and James Fallis got into a fight because Jerrod told James Fallis that Gregg had spun rocks and gravel on James Fallis's car. TT 607. James Fallis was not in the car when the incident happened, but Jerrod was and Jerrod told him about it. *Id.* When they were on the road outside the mint farm later in the evening, James confronted Gregg about the rock incident. TT 607-08. After James Fallis knocked Gregg down, Chaske went over and kicked Gregg. TT 608. Jerrod went over and pulled Chaske off Gregg. Jerrod and Brent helped Gregg get up and made sure he was o.k. *Id.* Chaske and James Fallis left in James Fallis's car. TT 609. Jerrod and Brent went to get into the car, and left Gregg and Jake standing in the road. *Id.* As Jerrod was getting in the car, Jake hollered to hurry up and leave because Gregg had a gun. TT 610. Jerrod looked to see Gregg pointing the gun at him. *Id.* It was the same one he had seen earlier. *Id.* Jerrod didn't think Gregg would really shoot, so walked back to Gregg and Jake. TT 611. Jake grabbed the gun away from Gregg. TT 610. Jerrod asked Gregg why he did that, and Gregg said he was sorry, he thought they were someone else. *Id.* Jerrod chastised Gregg, and Jake assured Jerrod he'd get Gregg home all right. TT 612. Jerrod, Brent and Amber left the area. TT 613. Jerrod was angry about the incident, and he was angry with Chaske for kicking Gregg when he was down. TT 613. Jerrod ran into James Fallis and Chaske a little further down the road, and Jerrod confronted Chaske again about kicking Gregg while he was knocked out on the ground. TT 614. Jerrod ended up hitting Chaske. *Id.* Then the Fallis brothers parted ways again. *Id.* James Fallis and Chaske left together in James Fallis's car, and Jerrod stayed in Brent's car. *Id.*

## E. Brent Sazue

Brent Sazue was James Fallis's cousin. TT 578. He and his then-girlfriend Amber Tapio were invited to the the mint farm on the evening of July 3, 2004 by the Fallis brothers and others. When he and Amber left the mint farm that evening, they encountered Gregg, Jake and Jim Fallis on the road. TT 583. Jerrod left earlier in James Fallis's car to take Heidi Ogle home. He returned and met the rest of them on the road outside the mint farm. TT 584. Jerrod told his brother James that Gregg had thrown rocks onto James's car. *Id.* An altercation occurred between Gregg and James Fallis on the road. TT 585. They argued, and James Fallis hit Gregg twice, putting Gregg on his back. *Id.* Gregg was laying on the side of the road, partially in the ditch. *Id.* Then Chaske

12

started kicking Gregg in the head. Jerrod grabbed Chaske and Brent held him while Jerrod chewed him out. *Id.* Brent, Jerrod and Jake helped Gregg get up. *Id.*

Jake said he was going to take Gregg home. TT 586. Brent turned around and started to walk to his car. He heard Jake holler to get out of there, because Gregg was going for his gun. *Id.* When he turned, Brent saw both Gregg and Jake holding the gun. *Id.* Jerrod walked over to Gregg and Jake, and Brent followed. TT 587. As they approached, Gregg said "wrong guys." *Id.* The foursome talked and Jerrod chewed Gregg out. Gregg just nodded his head. Things settled down. *Id.*[3] Jake, Jerrod and Amber left. TT 588.

## F. K.R.W.

K.R.W. grew up in the West Bend community. TT 70. He was staying there on the evening of July 3rd, 2004 into the morning of July 4th. TT 71. He was staying with his cousin, K.R.T. *Id.* Guy St. John is K.R.W.'s grandfather. TT 72. K.R.W. was outside in front of his Aunt's trailer when a truck pulled in. TT 75. The truck pulled in fast. TT 77. K.R.W. and his cousin ran around back to the picnic table. TT 78. James Fallis and Chaske had arrived at Guy St. John's trailer before the pickup arrived. TT 79. Chaske is K.R.W.'s cousin. *Id.* The pickup parked right behind the car that James and Chaske had arrived in. TT 80. K.R.W. only saw the back of the head of the person driving the pickup. TT 89.

K.R.W. saw James Fallis come out of the front door of Guy St. John's trailer. TT 81-82. James ripped his coat off when he came out of the trailer. TT 99. K.R.W. heard James and the person in the truck arguing with each other. TT 82. The argument was about racing on a dirt road and rocks being spit on a car. TT 85. Only James Fallis's voice was raised. *Id.* James Fallis tried to open the driver's side door of the pickup. *Id.* The door opened, then shut. TT 86. K.R.T. came out of the trailer and stood in front of the pickup, but then took off running. TT 86-87. James

---

[3]Gregg claims he has no memory of this portion of the incident. He testified he does not remember anything between getting kicked while he was partially in the ditch and waking up sitting in his pickup with his head on the steering wheel with Jake next to him. TT 790-91.

Fallis started to walk away from the truck. TT 88. K.R.W. never saw anything in James Fallis's hands, nor did he see James Fallis have any physical contact with the person in the truck. TT 94. K.R.W. did not hear James Fallis say anything about having a gun. TT 95. James Fallis was running toward his car. TT 102. The next thing K.R.W. heard was shots firing. *Id.* Then James Fallis started to run. *Id.* When James Fallis got inside the trailer, the pickup backed up and went between the trailers and left the same way he had come in. TT 90, 92.

## G. D.A.

D.A. was thirteen years old at the time of the incident and fourteen years old at the time of trial. TT 105, 123. He was in the West Bend neighborhood in the early morning hours of July 4, 2004. TT 106. He was with K.R.W. r and K.R.T. TT 107. D.A. and K.R.W. went to Mary Jo Red Water's house and sat on the front porch. TT 108. They heard a pickup coming, and went to the picnic table at the back of the house. TT 110. The pickup stopped in front of Guy St. John's trailer, and James Fallis came out of the trailer and off the porch. TT 111-12. James took off his coat and started arguing. TT 112. James Fallis told the driver to get out of the pickup and that he wanted to fight him. TT 113. K.R.T. was standing next to James by the truck's mirror. TT 126. D.A. could not hear anything that the pickup driver said. TT 113. D.A. did not see anything in James Fallis's hands. *Id.* He did not see James Fallis make any physical contact with the person in the truck. TT 114. James tried to open the truck door. *Id.* The door opened and then closed. *Id.* Then James turned and backed up. *Id.* When James backed up, K.R.T. took off running. *Id.* D.A. heard James Fallis say "do you want to fu\*\* around with guns?" TT 128. D.A. did not hear James Fallis say "I've got a gun." TT 119. James Fallis ran to the trunk of his car. TT 127. D.A. thought James was running to get a gun. TT 129. D.A. never saw the car door or trunk open. TT 129. After that the driver started shooting. TT 116. James Fallis tried to get into the trailer, and fell into the porch. TT 117. After the shooting stopped, the pickup left. TT 118. The pickup had trouble leaving first going forward, then it backed up and left the same way it came in. *Id.* D.A. and K.R.T. told Mary Jo what had happened, and she called the police. TT 120.

14

## H. K. R. T.

K. R.T. was sixteen years old at the time of trial. TT 131. He was staying with this Aunt Mary Jo on July 4, 2004. TT 132. He was at Guy St. John's trailer with K.R.W. and D.A. TT 123. James Fallis and Chaske Red Tomahawk arrived in James's car. TT 134. K.R.T. was inside the trailer. TT 135. He heard a loud pickup truck arrive. *Id.* James left the trailer, and Chaske went out the back door. TT 136. K.R.T. followed James out a few seconds later. *Id.* K.R.T. described the person in the pickup as a white guy with short hair and a black eye. TT 138. K.R.T. got close enough (to the driver's side door) to see him. *Id.* K.R.T. heard the two men arguing, and he heard the pickup driver ask where Chaske was. TT 139. He did not hear the driver apologize for anything. *Id.* James Fallis did not have anything in his hand, nor did he have any physical contact with the pickup driver. TT 140. The vehicle was not running. TT 141. James opened the driver's side door, and the driver pulled out a gun. *Id.* K.R.T. heard James Fallis say "do you want to fu\*\* with guns?" TT 142. K.R.T. did not hear James Fallis say he had a gun. TT 149. James Fallis went toward his car. TT 143. K.R.T. heard gun shots coming from the truck. TT 144. K.R.T. went inside the trailer though the back door. TT 145. K.R.T. ran to his Aunt Mary Jo's house and she called 911. TT 147.

## 2. § 2255 Evidentiary Hearing

A transcript of the evidentiary hearing which was held on May 12, 2009 is on file with the clerk as Doc. 271. Four people testified at the hearing, and sixteen exhibits were received into evidence.

### A. James Gregg

Gregg knew James Fallis prior to the incident which occurred on July 4, 2004. James Fallis lived eight miles down the road from Gregg, and he knew him from growing up and seeing him around and hearing about him. HT 33. He first encountered James Fallis on the school bus in elementary school. *Id.* It was a forty-seven mile ride to school on the bus; he and the Fallis brothers were the first ones to get on the bus because they were the furthest from school. HT 36. James Fallis was a bully on the bus. He would pick on the younger people. *Id.* James Fallis always pulled

15

Gregg's sister's hair. *Id.* James Fallis threw kids' books down or punched the back of the bus seat. HT 37. James Fallis got kicked off the bus, so Gregg did not see him much after that first year on the bus. HT 37. Gregg saw James Fallis occasionally throughout junior high and high school. HT 37. He saw him at the local store, at basketball games, and hunting in the fields. *Id.* Gregg saw him and heard about him occasionally up until the time of the July 4, 2004 incident. *Id.*

Gregg always wanted to stay on the good side of James Fallis. HT 38. He did not want to be seen as a threat to James Fallis. HT 38. Gregg's father warned him to stay away from James Fallis, and Gregg had heard that Fallis could be a very violent person. *Id.* He did not consider himself to be a good friend of James Fallis's, in that he never sought James Fallis out and James Fallis never sought him out. He never called James Fallis or went to his house. HT 38-39. Gregg tried to stay away from James Fallis, but if he ran into him, he did not run away because that made Fallis come after you even worse. HT 39. Gregg just tried to stay on James Fallis's good side. *Id.*

Gregg was aware of several instances of James Fallis's violent temper. HT 40, EX B. The first instance involved a friend named Zak Gravatt. HT 40. Zak is Native American but lived with a white family (the Ogles) because he'd had problems with his own family. In approximately 1997, Zak told Gregg of an instance when Zak and Stacy Ogle (a male) were on their way to a party together when they stopped at a store in Fort Thompson. HT 41. James and Pete Fallis pulled up in a vehicle, and James Fallis immediately started a fight with Zak. *Id.* The fight was so violent that Stacy Ogle ran and hid behind some trees. HT 42. Zak did not know why James Fallis attacked him. *Id.*

The second instance about which Gregg testified involved Gregg's cousin, Shane Bren. HT 43. In 1999 or 2000, Gregg accompanied Mr. Bren on a trip to the housing in which Bren was looking for someone from whom he could buy some marijuana. HT 44-45. Bren mentioned that he knew James Fallis sold it, but Bren did not want to buy it from James Fallis because Fallis had a gun. *Id.*

16

In approximately 2000, Gregg's father told him about an incident at the boat dock which involved James Fallis. HT 46. Gregg also heard about this incident from others in the community, including neighbors, other relatives, and his grandfather. *Id.* The boat dock incident was notorious in the community. *Id.* Gregg's cousin, Todd Cowan, was down at the river with his kids. The turnaround area is all gravel. As Todd and his kids were walking, James Fallis's car pulled in and spun a whole bunch of cookies, spraying gravel on everyone. HT 47. Two officers were present and the female officer confronted James Fallis. *Id.* When she began to walk away, James Fallis went after her in a fit of rage. Todd Cowan intervened and James Fallis took off. *Id.* Fallis returned with backup and got out of the car with a tire iron. HT 47. He was in a fit of rage and swung the tire iron at Todd Cowan. HT 48. The other officer saw what was happening and pulled a pistol to get James Fallis to stop. *Id.* Fallis threatened the officer. *Id.* Todd told Gregg's dad that Fallis was ready to attack the officer and that Fallis was in a violent rage. *Id.* As a result, Gregg's father told him to stay away from James Fallis and the boat dock area or Joe Creek or anyplace else James Fallis might be. HT 48-49. Gregg did avoid the boat dock even though it was very inconvenient when he wanted to use his family's boat or wake board. HT 49. The boat dock incident made an impression on Gregg because it appeared Fallis did not comprehend what was going on if he was willing use a tire iron to attack a police officer. HT 50. Gregg knew James Fallis had pugilistic skills and that he was willing to fight people and would not back down. HT 49.

In 2003 or 2004, Gregg's father told him of another incident which occurred at the Longbranch bar in Pierre, South Dakota. James Fallis got into an argument with a couple inside the Longbranch. HT 51. Gregg does not know the names of the couple. HT 100. All three got kicked out of the Longbranch, and when they got outside, James Fallis wanted to fight with the man. HT 51. The man did not want to fight, and he and his girlfriend got into their car. Fallis would not let them leave. *Id.* When the man tried to back out of the parking lot, James Fallis jumped on the hood of their car, banging on the hood and the windshield. HT 52. The bouncer witnessed the event, and as a result, James Fallis was barred from the Longbranch for life. *Id.* This reinforced Gregg's impression that he should stay away from James Fallis and that James Fallis would not let anyone get away from a fight even if they wanted to back down. *Id.* Gregg said, "once he had his eyes

17

locked on you, he was going to—he was going to follow through with it no matter what the task." HT 52.

The final incident about which Gregg testified involved one of James Fallis's ex-girlfriends. HT 52. The incident occurred in approximately June, 2004. *Id.* Gregg and his cousin Beau drove to Pierre and encountered two girls walking along the road. They offered the girls a ride and learned through conversation that one was James Fallis's ex-girlfriend. HT 53-54. The girlfriend indicated she'd ended her relationship with James Fallis because he was violent. HT 54.

Gregg explained his knowledge of all these instances of previous violent conduct by James Fallis would have helped him to explain to the jury why he was so afraid of James Fallis. HT 58.

I was precluded from saying exactly why I was afraid of him, why I was scared of him. If I could have given these instances that I knew of before, the way he acted that night, I mean, the way he come after me, the way he had this temperament about him, the look in his eyes—I mean, if you could have seen all of that that night and you would have known these past experiences from him, I mean, it would have been like the greatest fear in your life coming alive right in front of you. I mean there's no getting around it. There is—this guy was going to kill me.

** When he turned, he made the motion that he was going to get a gun out of the trunk of his car. I mean, at that point, everything that I've heard about him, you know, what I just seen from him that moment, I mean, I was so scared. I mean, I've never been so scared in my life. This is something over the top of what I even experienced over in Iraq. I mean, this guy was going to kill me because I was trying to defend myself. And the only way I could keep him from getting me out of that truck was to pull a gun. And I wanted him to back away, and I said that. He backed up and he made the further threat. Oh, you want to fu** with gun? Well I got guns. And he ran right to the trunk of his car. I had to stop him. I couldn't let him get to the trunk of his car. I had to stop him. There was no getting out of the situation. I was in a dead-end road. I couldn't back up. There was no lights. There's people all around me. There was no way I could get out of there. I couldn't let him get a gun out of the trunk and shoot me.

***He's never been known to back down out of a fight. He's—all of the instances that I've known—I mean, he attacks a park ranger with a tire iron, you know. He's coming after him. He comes after Todd with a tire iron just because he stops him,

18

you know, from attacking a woman. He won't let a person leave a fight at the Longbranch. I mean all these instances, it just clicked right then and there, you know. I've had all these feelings about him, you know, wanting to stay away from him, you know, as much as I could and be on his good side, you know. And it all drops dead right there, and he comes right after me, you know. ***

HT 58-60.

Gregg discussed each of these prior instances of James Fallis's violence with his trial attorney, with the possible exception of the ex-girlfriend. HT 61, 90. To the best of Gregg's knowledge, none of these prior instances of James Fallis's violence resulted in criminal charges against Fallis. HT 95.

## B. Leon Leuning

Mr. Leuning is a retired South Dakota Wildlife Conservation officer and a bronze sculptor. HT 104. He became acquainted with James Fallis because of an incident which occurred at the Joe Creek boat dock on June 5, 1999. *Id.* EX 1. Leuning was inspecting walleye fisherman on Lake Sharpe that day. He was in full uniform, wearing a badge, and armed with a 40 Smith & Wesson Glock. HT 114. His female co-park ranger notified him that there was an incident in progress at the boat ramp. HT 107-08. He ran to the boat dock and saw a pickup truck with two males inside. One got out and started yelling at Todd Cowan. HT 110-11. The person yelling was James Fallis. HT 111. Leuning saw Mr. Fallis obtain a tire iron out of the pickup truck. HT 112. As Leuning approached, James Fallis raised the tire iron above his head in a menacing fashion and moved toward Cowan. *Id.* Fallis's speech was incomprehensible and he was frothing and spitting. HT 112-13. His eyes were out of focus. HT 113. Cowan did not make threats or comments, but merely stood his ground with his hands on his hips with his children behind him. HT 113. Leuning got to the scene in time to get between the two men. *Id.* Leuning believed Cowan was in imminent danger. HT 115. Leuning drew his weapon and ordered James Fallis several times to drop the weapon. *Id.* Mr. Fallis was between six and twelve inches from the barrel of the gun with the gun pointed directly at his face. *Id.* Fallis continued to ignore Leuning and try to get around him to hit Cowan with the tire iron. *Id.* Leuning finally told Mr. Fallis to drop the weapon or he'd "blow his head off." HT 114. Fallis reluctantly dropped the tire iron, and Leuning placed Fallis in handcuffs. *Id.*

Mr. Leuning's incident report, prepared the day after the boat dock incident, does not describe the incident in as vivid detail as he described it during his testimony at the evidentiary hearing. *See* EX 1. For example, he does not describe the frothing and spitting or the unfocused eyes in the incident report. Leuning also estimated Fallis was three feet rather than one foot from the gun when he finally dropped the tire iron. Leuning also did not describe the tire iron as "large" in the report. HT 127. Leuning did not express in his report that he almost killed Fallis, because he did not think that was an appropriate thing to write in an official report. HT 152.

Gregg's trial attorney hired a private investigator to interview Leuning about the boat dock incident. The investigator conducted a recorded interview with Leuning on September 23, 2004. EX E. Leuning incorrectly guessed that the incident occurred in 2000, although the incident report on file indicates it occurred on June 5, 1999. He did not correctly recall the date until he reviewed the incident report. HT 146. During the recorded interview, Leuning commented that he "almost had the pleasure" of killing James Fallis. Leuning also referred to James Fallis as a "jerk off" a "little shit" a "menace" a "piece of work" a "crazy bastard" and an "idiot" and told the investigator Fallis was "blowin snot and spit" during the incident. *Id.* He also opined that James Fallis had "psychotic tendencies" and a "hair trigger temper" and that he went "ballistic when he got pissed." Leuning referred to the Fallis family in general as "bad eggs" and "shitbags" and called James Fallis the "top turd." Leuning also expressed displeasure with the Federal system for "dropping the ball" in the prosecution of James Fallis for the boat dock incident. EX E. Leuning suggested that although James Fallis, had been arrested many times, he was never prosecuted because his father was a Tribal Councilman. Leuning likened Tribal politics to "third world politics."

Gregg's habeas attorneys taped Leuning's statement for purposes of his sentencing and/or his § 2255 petition. *See* EX D. It contains the same facts as the incident report (with the exception that the tape, like the recorded interview, also makes reference to the wrong date). The tape is narrated in somewhat colorful terms but leaves out the majority of expletives and unflattering references to James Fallis which were made in the taped interview.

20

### C. Lucy Fallis

Lucy Fallis is James Fallis's younger sister. HT 161. She was nineteen years old at the time of the evidentiary hearing. *Id.* She was present at the boat dock incident, and was ten years old at the time. HT 162. She recalls that her brother (James Fallis) drove her, her youngest brother and three of her nephews down to the river. HT 162-63. The brakes on the pickup were not good, and some gravel was thrown. HT 163. Todd Cowan was present and "got in a little thing" with James. HT 164. They were trying to fight or wrestle. HT 165. She heard Todd Cowan threaten James. HT 166. After that, her father took her home in his pickup truck. HT 168.

### D. Vilas James Fallis, Jr.

Mr. Fallis is James Fallis's father. HT 172. He witnessed part of the boat dock incident in 1999. *Id.* James drove to the boat dock with some of the other children, and Mr. Fallis drove down a little later to check on them. HT 174. He found his two younger children and his grandchildren but not James, so he took the other children and his grandchildren home. HT 177. Mr. Fallis found James, and returned to the boat dock area with James and James's twin brother Jerrod. HT 181. Mr. Fallis and Todd Cowan argued, and James grabbed a tire iron out of the back of Mr. Fallis's pickup. HT 182-83. James did not swing at Todd but just feinted at him. HT 183. Mr. Fallis told James to put the tire iron down and James did so. When Mr. Fallis turned around, there were two officers with guns. HT 183. The BIA and the Sheriff's office came to the scene, and James was held in jail over the weekend. HT 186-86. Mr. Fallis typed up a report about the incident on one of his computers and turned it in to someone (he cannot remember who), but he is not sure if he still has a copy of it. HT 186-87. [4]

---

[4]After the evidentiary hearing, the attorney for the Government mailed a letter to the Court with an attached email and computer printout of an account of the incident which was purportedly written shortly after the boat dock incident by James Fallis himself (not Vilas James Fallis, Jr.). The letter, attached email, and typed account are contained in the docket and have been reviewed by the Court. Because neither the email nor the typed account were accompanied by an affidavit from either Vilas James Fallis, Jr. nor the attorney for the Government attesting that the documents were what they purported to be, they are not considered part of the official record. Even if they had been so authenticated, however, the Court's conclusion in this matter would remain the same because the written account purported to have been authored by James Fallis verifies Gregg's claim about the significant facts surrounding the incident. The written account indicates James Fallis was involved

21

## E. Trial Attorney's Affidavit

Gregg's trial attorney did not testify at the evidentiary hearing, but the Government submitted his affidavit. *See* EX R. The attorney explained he was aware of the specific instances of violence by James Fallis outlined in Gregg's § 2255 petition. He conducted legal research to determine whether he could introduce evidence regarding James Fallis's prior specific instances of violence–especially the boat dock incident-- and decided he could not. *Id.* at ¶ 7. He believed the law of the Eighth Circuit at the time allowed only opinion or reputation evidence. *Id.* If he would have known of a way to get specific instance evidence before the jury, he would have done so. *Id.* at ¶ 10. He viewed the specific instance evidence as propensity evidence, and therefore inadmissible. *Id* . at ¶ 11. Currently, he believes the specific instance evidence would go to Gregg's state of mind and was a factor in Gregg's decision to do what he had to do to save his own life. *Id.* at ¶ 12. The decision to not introduce James Fallis's prior specific instances of violence (particularly the boat dock incident) was not a strategic decision. If he had known a way to introduce the evidence, he would have. *Id.* at ¶ 13. He considered the use of Fed. R. Evid. 404(b) as an avenue to introduce James Fallis's prior specific instances of violence to the jury, but believed 404(a) and 405 limited /prevented such use and allowed proof by way of character or reputation only. *Id.* at ¶ 14. Based upon his understanding of the law and the court's rulings, he directed his witnesses not to mention any specific instances of James Fallis's violence unless the door was opened on cross-examination. *Id.* at ¶ 15. He does not know what effect the prior specific act evidence would have had on the jury, but believes it would have better explained Gregg's actions. *Id.* at ¶ 16.

## ANALYSIS

Ineffective assistance of counsel claims require a showing (1) that the attorney's performance was deficient, falling below professional standards of competence; and (2) that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d (1984). The reviewing court should "defer to reasonable trial strategies

---

in an altercation with Cowan, left the scene, returned later and threatened Cowan with a tire iron. The written account also indicates James Fallis dropped the tire iron only after park rangers pointed their firearms at him.

and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*, 466 U.S. at 689, 104 S.Ct. at 2065. To show prejudice, the petitioner must show "there is a reasonable probability [sufficient to undermine confidence in the outcome] that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *United States v. White*, 341 F.3d 673, 677 (internal citations omitted). The Court should consider whether "the result of the proceeding was fundamentally unfair or unreliable." *Id.*, citing, *Lockhart v. Fretwell*, 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993).

A reasonable probability that the outcome would have been different is less than "more likely than not" but it is more than a possibility. *Paul v. United States*, 534 F.3d 832, 836 (8th Cir. 2008). The petitioner bears a "heavy burden" to prove his trial counsel failed to exercise customary skills and diligence that a reasonably competent attorney would perform under similar circumstances. *Smith v. United States*, 635 F.2d 693, 698 (8th Cir. 1980).

Ineffective assistance of counsel claims are mixed questions of law and fact. *United States v. White*, 341 F.3d 673, 677 (8th Cir. 2003). The district court's factual findings will be reviewed under the clearly erroneous standard, but the ineffective assistance issue finding is reviewed de novo. *Id.*

## 1. Admissibility of 404(b) Evidence to Prove Gregg's State of Mind

"Although specific acts evidence is not admissible to prove a victim acted in conformity with his character under 405(b), such evidence may admissible under 404(b) to prove a defendant's state of mind." *United States v. Gregg*, 451 F.3d 930, 935 (8th Cir. 2006), *citing, United States v. Milk*, 447 F.3d 593, 600 (8th Cir. 2006). Evidence of specific instances of James Fallis's prior violent conduct for purposes of proving a Gregg's state of mind, however, is only admissible if Gregg establishes knowledge of James Fallis's prior violent conduct at the time of the underlying offense. *Gregg* at 937. On direct appeal, the Eighth Circuit acknowledged that specific instance evidence was never properly presented so the district court did not have the opportunity to rule on its admissibility *Id.* at 935-936 & n.8.

23

During the evidentiary hearing, Gregg testified he knew about James Fallis's prior violent conduct at the time of the incident. HT 90. *See also,* EX B, ¶ 6a-l. Gregg told his attorney about this knowledge. *Id.* , ¶ 8-9, HT 93. Gregg's trial attorney, however, informed Gregg that the law of evidence would not permit him to mention specific incidents. EX B at ¶ 11-12. Had he been permitted to do so, Gregg would have testified at trial about James Fallis's past specific instances of violent conduct. *Id.* at ¶ 14. His trial attorney told him the evidence was not admissible. Gregg believed his attorney so he did not discuss the incidents during the trial. HT 90.

"The Government's contention that evidence of a victim's prior bad acts are never admissible is incorrect." *United States v. Milk,* 447 F.3d 593, 600 (8ᵗʰ Cir. 2006). *Milk* cited *United States v. Waloke,* 962 F.2d 824, 830 (8ᵗʰ Cir. 1992). *Waloke* recognized that specific instances of the victim's violent conduct may be admissible in some instances under Rule 405(b). It did not specifically discuss admissibility of a victim's prior bad acts for purposes of proving the defendant's state of mind under Rule 404(b). In both *Milk* and *Waloke*, however, the Eighth Circuit–while clearly recognizing that in some instances the victim's prior bad acts are admissible, affirmed the district court's exclusion of specific prior bad act evidence. In *Milk* the evidence was offered under Rule 404(b) as state of mind evidence, but was refused because (1) there was a significant risk of a "mini-trial" because there was no conviction for the prior incident and there were only two witnesses (one of whom was the defendant); and (2) the probative value was weak as to the defendant's fear of the victim, because the victim's previous violent conduct occurred five years earlier and the defendant and the victim remained good friends afterwards. *Milk,* 447 F.3d at 600. In *Waloke,* the specific act evidence was offered under Rule 405(b). The evidence was rejected because the district court determined it was unfairly prejudicial, confusing and misleading and would have led to "collateral mini trials" under Rule 403. Eighth Circuit decided the district court acted within its "wide discretion" in excluding the evidence. *Waloke,* 962 F.2d at 830.

Eighth Circuit case law holds the victim's prior bad acts could or might be admissible to prove the defendant's state of mind, but the district court does not necessarily abuse its discretion

24

by excluding them. Other Courts, however, have explained when the victim's prior bad acts *must* be admissible. Gregg's proffered evidence must be measured against those examples as well.

"Self defense is about as basic a moral and legal principle as there is." *United States v. James*, 169 F.3d 1210, 1215 (9th Cir. 1999) (citation omitted). *James* held that exclusion of evidence regarding the victim's prior violent conduct was an abuse of discretion, because it was crucial to the jury's ability to determine the defendant's credibility, not the victim's character. *Id.* at 1215. "Because the crux of [the defendant's] defense rested on her credibility and because her credibility could be directly corroborated through the excluded documentary evidence, exclusion of the documents was prejudicial and more probably than not affected the verdict." *Id.* Certain acts of violence by the victim "are admissible to corroborate defendant's position that he reasonably feared he was in danger of imminent great bodily injury." *Govt. of the Virgin Islands v. Carino*, 631 F.2d 226, 229 (3rd Cir. 1980) (referring to Fed. R. Evid. 404(b)).

When self-defense is the defendant's explanation for killing another human being, "there is simply no denying that the most important witness . . .is the [defendant herself]." *DePetris v. Kuykendall*, 239 F.3d 1057, 1062 (9th Cir. 2001). Excluded evidence that would have explained what the defendant knew about the victim "would have corroborated petitioner's testimony [and] prevented [her] from testifying fully in [her] behalf about why [she] did what [she] did–this in a case where proof of the defendant's state of mind was an essential element of the defense." *Id.* at 1062-63. The *Kuykendall* Court noted the significance of the erroneously excluded evidence in that case was not so much the proffered evidence itself, but "petitioner's own testimony about how [it] influenced her assessment of the danger she perceived." *Id.* at 1063. Because the defendant in *Kuykendall* was precluded from testifying fully about her state of mind and from presenting evidence that would have corroborated her testimony, the Ninth Circuit held that her Fifth Amendment right to due process and Sixth Amendment right to present a defense were violated. *Id. See also, Smith v. Dretke*, 417 F.3d 438 (5th Cir. 2005) (discussing admissibility of victim's prior violent conduct "defendant's only plausible defense was that he acted in self-defense. He testified to the [victim's] aggressive behavior on the night in question and to his own apprehension of mortal danger during

25

the conflict. Without corroboration, though, these statements were easily discounted by the prosecuting attorney.").

Gregg's assertion that the Rule 403 balancing test does not apply to 404(b) state of mind evidence is rejected outright. Rule 403 is applied in all of the Eighth Circuit case law regarding the admissibility of specific acts of violence by the victim under Rule 404(b) to prove the defendant's state of mind. *See, e.g. Gregg*, 451 F.3d at 935; *Milk,* 447 F.3d at 600. *See also, United States v. Bordeaux*, 2008 WL 509456 (D.S.D. Feb. 22, 2008). In *Bordeaux*, Judge Conmy applied Rule 403 balancing test and astutely recognized "the best evidence is always prejudicial. Evidence only becomes unduly prejudicial when it would suggest to a jury that it decide a case on an emotional or other improper basis." *Id*. at *1. In *Bordeaux*, Judge Conmy allowed the defendant to testify about specific acts of violent conduct by the victim which were known to the defendant prior to the shooting. "This testimony will assist the jury in deciding whether he had a subjective fear of imminent grave injury and whether that fear was reasonable." *Id.* at *2.[5]

The Rule 403 balancing test is key to the admissibility of Gregg's proposed testimony about specific instances of James Fallis's past violent conduct.[6] Both Gregg and the Government cite

---

[5]Jury instruction No. 15 in Gregg's murder trial instructed the jury as to the requirements for Gregg's self defense argument:

> If a person reasonably believes that force is necessary to protect himself from what he reasonably believes to be unlawful physical harm about to be inflicted by another person and uses such force, then he acted in self defense.

> However, self defense which involves force likely to cause death or great bodily harm is justified only if the person reasonably believes that such force is necessary to protect himself from what he reasonably believes to be a substantial risk of death or great bodily harm.

[6]Although Gregg persistently asserts the balancing test should be performed not by this judge but during re-trial by the district court, that is a practical impossibility. The purpose of the evidentiary hearing was to establish the factual basis for this judge to offer a recommendation to Judge Kornmann about whether the habeas motion should be granted or denied. Some form of the balancing test must be done during this habeas proceeding in order to make that recommendation. It **must** be determined, therefore, whether the evidence Gregg claims should have been offered

*United States v. Chase*, 451 F.3d 474 (8th Cir. 2006)as authoritative. "When evidence is offered to prove state of mind, we presume that the evidence is admissible for that purpose." *Id.* at 479. Rule 404(b) evidence is admissible if it is (1) relevant to a material issue; (2) similar in kind and close in time to the event in issue; (3) supported by sufficient evidence to support a finding by the jury that the act occurred. *Chase*, 451 F.3d at 479-80, *citing*, *United States v. Johnson*, 439 F.3d 947, 952 (8th Cir. 2006). "If the probative value of the evidence is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative issues, the evidence may be excluded under Rule 403." *Chase*, *Id.*. In *Chase* the proposed evidence was excluded because it involved specific instances of violence by persons other than the victim, and the district court feared the offer would evolve into collateral "mini-trials" about the four previous incidents, which would cause the evidence to be prejudicial, confusing, and misleading. *Id.* at 480.

"Unfair prejudice under Rule 403 means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." *United States v. Marshall*, 683 F.2d 1212, 1216 (8th Cir. 1982) (*citing*, Advisory Committee's Note, Rule 403, Fed. R. Evid.). The analysis must begin with the presumption that the proposed evidence is admissible if it is relevant, and it may be excluded only if there is a "clear disparity between the degree of prejudice [and the] probative value." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. App. 1999).

That James Fallis pulled Gregg's sister's piggy tails on the bus in grade school, or unsubstantiated rumors that he might have stolen things out of someone's garage or sold marijuana

---

would have been admissible during the original trial. As the Eighth Circuit recognized on direct appeal, had the specific act evidence been offered to the district court, "it may well have determined the evidence should have been excluded under Rule 403." *Gregg*, 451 F.3d at 935, n. 6. The failure to offer inadmissible evidence is not ineffective assistance of counsel. *Kavanagh v. Berge*, 73 F.3d 733, 736 (7th Cir. 1996). Contrary to Gregg's assertion, therefore, this Judge must guess what might have happened had Gregg's counsel pursued an effort to admit specific act evidence to prove Gregg's state of mind under Rule 404(b). Thereafter, Judge Kornmann, as the one who would have made the actual ruling, may adopt or reject the recommendation pursuant to 28 U.S.C. § 636(b)(1)(C).

at some time in the past are hardly relevant and clearly do not meet the similarity or sufficiency test outlined above. Although Gregg cited several specific incidents in EX B and during his evidentiary hearing testimony, the focus of his § 2255 motion quickly and definitively became the 1999 "boat dock incident." The only other incident which was described in enough detail to be characterized as close enough in time and similar enough in character to the events of July 3-4, 2004, was the fight incident at the Longbranch which occurred in 2003 or 2004. Those two incidents occurred during James Fallis's adult years[7] and touch upon the manner in which he conducted himself during a confrontation, or his willingness or unwillingness to walk away from a fight. Accordingly, they will be analyzed under Rule 403.

## A. The 1999 Boat Dock Incident

When evidence is offered to prove state of mind, "we presume that the evidence is admissible for that purpose." *United States v. Chase*, 451 F.3d 474, 479 (8th Cir. 2006). In order to remain admissible, the boat dock incident must be (1) relevant to the material issue ; (2) similar in kind and close in time to the event at issue ; (3) supported by sufficient evidence to support a finding by the jury that the act occurred. If, however, the probative value of the evidence is outweighed by the dangers of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative issues, the evidence may be excluded under Rule 403.

What Gregg knew about James Fallis's past behavior during a confrontation is relevant to whether Gregg's reaction to the situation during the early morning hours of July 4, 2004, was reasonable. For this reason, the boat dock incident is relevant to a material issue, namely Gregg's self defense argument.

_____

[7]The boat dock incident occurred in June, 1999. During the sentencing hearing, James Fallis's father testified that James Fallis was twenty-six years old when he died in July, 2004. Five years earlier in 1999, therefore, he would have been twenty-one years old. *See also,* EX 1.

28

The altercation at the boat dock occurred in the summer of 1999–nearly five years before the incident which formed the basis for Gregg's murder indictment. That time span was partially responsible for rendering the evidence inadmissible in *Milk*. In *Milk*, however, the Court noted the probative value of the evidence was weak, because the victim and the defendant remained "close friends" after the victim's prior violent act. In this case, James Gregg testified at trial that he "got along great" with James Fallis, but he also explained the reason he got along great: he never invited James Fallis to his house, James Fallis never invited Gregg to his house, and that Gregg just tried to stay out of James Fallis's way. Gregg "tried to stay on the good side" of James Fallis. This testimony does not detract from Gregg's proposed 404(b) specific act evidence about James Fallis's conduct during the 1999 boat dock incident and why it caused Gregg to fear James Fallis.

It is also significant that James Fallis was twenty-one years old at the time of the boat dock incident. This was not the act of an impulsive child or teenager but of an adult, who at the time had his younger siblings and nephews in his care. The boat dock incident is also similar in kind to the Gregg altercation because (even by his own account, albeit un-authenticated) it appeared to be concluded, but James Fallis's anger was re-ignited because he perceived (whether correctly or incorrectly) that he had been wronged and the situation had not been remedied to his satisfaction. He left the scene but returned with heightened anger and threatened both the original source of his irritation–Todd Cowan-- and the one who he perceived to be supporting Todd Cowan--an armed park ranger.

Finally, there is sufficient evidence to support a finding by the jury that the 1999 boat dock incident really did occur. The Government does not really dispute that the incident occurred, but rather stresses the differences in the details as recounted by the various witnesses. The Government disputes whether the tire iron was "large" or regular size, and whether Leuning's gun was one foot from James Fallis's face or three feet away before James Fallis dropped the tire iron. The incident is recorded in an official South Dakota Game, Fish and Parks Incident Report (EX 1) and has been described on the record by two witnesses who were present (Leuning and Vilas James Fallis, Jr.). One of the trial witnesses (Todd Cowan) was also present during the boat dock incident. The 1999

29

boat dock incident meets the admissibility test under 404(b) for purposes of proving Gregg's state of mind during his altercation with James Fallis on July 4, 2004.

If, however, the probative value of the evidence is outweighed by the dangers of unfair prejudice, confusion of the issues, misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative issues, the evidence may be excluded under Rule 403.

The Government asserts the probative value of the 1999 boat dock incident is outweighed by the dangers of unfair prejudice and that the evidence would merely be cumulative of other evidence that James Fallis could be violent and that Gregg feared him. Gregg testified he was weak and in no shape to fight, and feared if James Fallis succeeded in getting him out of the truck, Fallis would beat him unconscious again and he'd never wake up. TT 823. Gregg testified about the fight that had occurred less than an hour before the fatal confrontation with James Fallis. A crowd of people were present during that confrontation, the fight broke up, and James Fallis left the area with Chaske after Chaske was chastised by others for kicking Gregg while he was on the ground. Beyond that limited evidence, however, the jury had no evidence to explain why Gregg allegedly feared that when James Fallis came out of Guy St. John's trailer and threw his coat off, he would lose complete control of his temper to the point of potentially killing Gregg. The jury heard about multiple other fights or disagreements between various members of this group of "friends" that had flared up throughout the evening, but those disagreements had been settled or forgotten after a little bit of pushing, shoving and shouting. The jury was never given perhaps the *only* evidence which *might* have provided a logical explanation for Gregg's alleged belief that his use of deadly force was reasonable: Gregg's knowledge of prior instances in which James Fallis's perception that he had been wronged by a person, unchecked, could evolve into an irrational, violent rage against the person whom James Fallis believed had committed the wrong. Jacob Big Eagle's testimony that the Fallis twins "do hurt people" (TT 501) and Todd Cowan's testimony that James Fallis "could be violent" fell far short of accurately describing what Gregg allegedly believed, based on his knowledge of prior specific incidents, about the extent of James Fallis's violent temper when he perceived he had been wronged. Gregg explained during the habeas hearing that

30

I was precluded from saying exactly why I was afraid of him, why I was scared of him. If I could have given these instances that I knew of before, the way he acted that night, I mean, the way he come after me, the way he had this temperament about him, the look in his eyes–I mean, if you could have seen all of that that night and you would have known these past experiences from him, I mean, it would have been like the greatest fear in your life coming alive right in front of you. I mean there's no getting around it. There is–this guy was going to kill me. \*\*\*. I mean all these instances, it just clicked right then and there, you know. I've had all these feelings about him, you know, wanting to stay away from him, you know, as much as I could and be on his good side, you know. And it all drops dead right there, and he comes right after me, you know. \*\*\*[8]

The Government's assertion that the differences between Cowan's version of the 1999 boat dock incident, Leuning's version, Mr. Fallis Jr.'s version, and the version as it was told to Gregg by Gregg's father and others would reduce the 1999 boat dock incident into an impermissible "mini-trial" which would be too distracting, and therefore confusing and prejudicial for the jury, is rejected. Judge Kornmann is not known to lose control of his courtroom, and whether Leuning, Cowan, Mr. Fallis Jr. or James Gregg's father embellished or eliminated details of the 1999 boat dock incident is not important. Rather, what is important is "petitioner's own testimony about how [it] influenced [his] assessment of the danger [he] perceived." *DePetris v. Kuykendall*, 239 F.3d 1057, 1063 (9th Cir. 2001). This Judge agrees with Judge Kornmann's assessment of the jury's abilities and believes a fully informed jury can separate the wheat from the chaff to reach the correct conclusion. *See* Sentencing TR at p. 276-77. "The best evidence is always prejudicial. Evidence only becomes unduly prejudicial when it would suggest to a jury that it decide a case on an emotional or other improper basis." *United States v. Bordeaux*, 2008 WL 509456 (D.S.D. Feb. 22, 2008). The 1999 boat dock incident is relevant to Gregg's state of mind under Rule 404(b) for purposes of his self defense argument and is not unduly prejudicial, nor has the Government persuaded the undersigned

---

[8]As Judge Kornmann noted during sentencing, the record which was established during trial was devoid of any evidence that Gregg was aware of James Fallis's prior specific acts of violence prior to the July 4, 2004 incident. Judge Kornmann quite strongly voiced his opinion that the absence of such evidence, combined with Gregg's decision to shoot James Fallis as Fallis was in the process of retreating from Gregg's vehicle, rendered Gregg's self-defense argument untenable. ST 268-71; 285-86. Judge Kornmann noted that Gregg had a lot of options, including driving away. In other words, there was an absence of record evidence to render Gregg's alleged belief that deadly force was necessary "reasonable" pursuant to Instruction No. 15.

that it would confuse the issues, mislead the jury, or cause undue delay, waste of time, or needless presentation of cumulative issues.

## B. The 2003-2004 Longbranch Saloon Incident

The Longbranch Saloon incident is relevant to Gregg's state of mind for the same reasons the 1999 boat dock incident is relevant. The Longbranch Saloon incident is also much closer in time to the event in issue. Without further information, however, it is impossible to evaluate whether the Longbranch Saloon incident is similar enough in kind, and supported by enough evidence to support a finding by the jury that it actually occurred to justify allowing this evidence to go to the jury in the event this case is re-tried. Gregg was unable to provide many details about the altercation, or the names of any of the people involved to substantiate the story he heard about James Fallis. The one link to the July 4, 2004 incident is that James Fallis was allegedly unwilling to let the man (who wanted to end the fight) leave. James Fallis allegedly jumped on the hood of the car and beat on the windshield to prevent the man from leaving the scene. In the event that Gregg is able to supply enough information to get this incident to the jury, it could provide support for his assertion that he did not believe leaving the scene in his vehicle was an option. At this time, however, Gregg has not supplied enough information to perform the Rule 403 analysis.

## 2. Whether Trial Counsel's Performance Was Deficient

To establish the first prong of the *Strickland* test, Gregg must demonstrate that trial counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. Judicial review of counsel's performance is highly deferential and the Court must apply a strong presumption that counsel's conduct falls within the wide range of professionally reasonable assistance and sound trial strategy. *Id.* at 689. "[E]very effort must be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.*

In this case, however, the failure to attempt to introduce specific instances of James Fallis's violent conduct pursuant to Rule 404(b) to prove Gregg's state of mind cannot be attributed to trial

32

strategy. Gregg's trial attorney candidly stated in his affidavit that he simply did not believe the evidence was admissible, so he did not proffer it. The 404(b) avenue of admissibility for Gregg's state of mind was not explored nor offered for Judge Kornmann's consideration. The Government asserts that trial counsel's failure to offer 404(b) as an avenue of admissibility was understandable, given the unsettled state of the law at the time of Gregg's trial. *See* Government's Brief, Doc. 252, p. 19-20. It is true that the law was unsettled and far from clear in the Eighth Circuit in January, 2005. "At the very least, trial counsel had a duty to investigate the law further in the face of unclear information . . ." *Armstrong v. Kemna*, 534 F.3d 857, 863 (8th Cir. 2008).

The evidence of James Fallis's prior specific acts of violent conduct for purposes of proving Gregg's state of mind under 404(b) would have been "indisputably favorable" to the defense. "One of defense counsel's duties is to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process. To fulfill that duty, counsel must offer at trial material, admissible evidence that is favorable to the defense." *Houston v. Lockhart*, 982, F.2d 1246, 1250-51 (8th Cir. 1993) (citations omitted). If admissibility is questionable, the evidence should be offered because even if the evidence is refused by the trial court "defense counsel would have made a record on a potentially powerful issue on appeal." *Id.* at 1252. That is precisely the point the Eighth Circuit made in this case when it noted that it had nothing upon which to base a ruling on the issue. *United States v. Gregg*, 451 F.3d at 935-36. In light of trial counsel's affidavit which states that he (1) was aware of James Fallis's prior instances of violence; (2) considered but did not pursue Rule 404(b) as an avenue of admissibility at trial; (3) believed the evidence would have strengthened Gregg's self-defense argument; and (4) had no strategic reason for not offering the evidence; in addition to his failure to make a proffer of the evidence at trial, if for no other reason to preserve the issue on appeal, the Court is left with no alternative under *Strickland* and *Houston* but to find that Gregg has satisfied the first prong of the *Strickland* test.

33

### 3. Whether Gregg Suffered Prejudice by Trial Counsel's Failure to Offer Specific Act Evidence

The second prong of the *Strickland* test requires Gregg to show he suffered prejudice as a result of the failure to offer evidence of James Fallis's specific prior acts of violence during the first trial. To show prejudice, Gregg must show a "reasonable probability" that the outcome of his trial would have been different. A "reasonable probability" is "less than more likely than not, but it is more than a possibility. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Paul v. United States*, 534 F.3d 832, 837 (8th Cir. 2008) (internal punctuation altered, citations omitted). It is this prong of the test which habeas petitioners practically never meet, because although criminal defendants have a constitutional right to present a complete defense, "a meaningful opportunity to present a complete defense does not translate into the right of a defendant to present any evidence he may deem important to his defense." *Strickland v. Lee*, 471 F.Supp.2d 557, 617 (W.D. N.C. 2007).

"Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture." *Strickland*, 466 U.S. at 695-96, 104 S.Ct. at 2069. This determination requires a "predictive judgment about how jurors would have weighed the totality of the evidence, including the new evidence . . .[therefore] it is important to review the record that was created in the trial itself, and the findings made by the jury on that record." *Paul v. United States*, 534 F.3d 832, 839 (8th Cir. 2008). The Government asserts the failure to present Gregg's knowledge of James Fallis's prior specific violent acts is not such an error, because (1) Gregg previously testified he "got along great" with James Fallis (2) sufficient character and opinion evidence was allowed; and (3) the evidence would have merely been cumulative.

It has already been discussed in Section 1A above that Gregg's testimony he "got along great" with James Fallis was qualified by his further explanation that he never went to James Fallis's house, Fallis never came over to Gregg's house, and Gregg just tried to stay on James Fallis's good side by staying out of his way. The jury considered the evidence and rejected the first degree murder charge in favor of a second degree murder charge, but also rejected Gregg's claim of self-

34

defense. Jacob Big Eagle's testimony that the Fallis brothers "do hurt people" and Todd Cowan's testimony that James Fallis "could be violent" are not a substitute for Gregg's own testimony about what he knew of James Fallis's prior behavior in similar situations, when the most important issue to prove his defense was whether his alleged belief that deadly force was necessary was *reasonable*.

In order for the jury to decide whether they believed Gregg's story that he reasonably believed he needed to shoot James Fallis in order to defend himself, it was crucial for the jury to understand what was in Gregg's mind at the moment he made the decision to shoot. The importance of the omitted evidence was punctuated by the prosecutor himself in his closing argument: "Jim Gregg . . .killed James Fallis with his 9 mm semiautomatic handgun . . .He shot him four times in the back and one time that went through the side. He did fire off nine rounds as shown by the casings that were found on the ground. The question, your determination, is why. . . .No one can get into Jim Gregg's mind. You can't reach in there, open his head, and know what he was thinking. But you can look at the evidence, the circumstances, the facts surrounding it, the event." TT 962. The prosecutor also punctuated the important role that Gregg's credibility played in deciding the issues in the case: " Credibility. That's a very important function. A jury has to decide the credibility of witnesses. And in this case the defendant's credibility. He did testify." TT 969.

Gregg's state of mind was a critical issue at trial. Proof of his credibility was crucial to his defense. "Because the crux of the defendant's defense rested on [his] credibility and because [his] credibility could be directly corroborated through the excluded . . .evidence, exclusion of the [evidence] was prejudicial and more probably than not affected the verdict." *DePetris v. Kuykendall*, 239 F.3d 1057, 1064 (9th Cir. 2001). *See also, United States v. Saenz*, 179 F.3d 686, 689 (9th Cir. 1999) (by excluding state of mind evidence, court prevented defendant from supporting his claim of self defense. "Error cannot be harmless where it prevents the defendant from providing an evidentiary basis for his defense."); *United States v. James*, 169 F.3d 1210, 1215 (9th Cir. 1999) (crux of defendant's self defense claim rested on her credibility and exclusion of evidence regarding victim's prior violent acts was prejudicial and "more probably than not affected the verdict.").

35

For all of these reasons, the failure to present evidence of James Fallis's prior violent acts, known to James Gregg, deprived Mr. Gregg of his constitutional right to present his defense and presents a reasonable probability–that is–a "probability sufficient to undermine confidence in the outcome" that the result of his trial would have been different. He has, therefore, satisfied the second prong of the *Strickland* standard.

## RECOMMENDATION

For the reasons more fully explained above, it is respectfully recommended to the District Court that Petitioner's Motion to Vacate, Set Aside, or Correct Sentence pursuant to 28 U.S.C. § 2255 (Doc. 225) be **GRANTED.**

## NOTICE TO PARTIES

The parties have already had ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court. Because the only amendment to this Report and Recommendation was to redact the references to the minor witnesses and replace them with their initials, there has been no change in substance and no justification for additional time for objections in the absence of an additional extension for good cause granted by the Court. The filing of this amended Report and Recommendation shall not extend the time for serving and filing objections beyond the time which has already been allowed.

*Thompson v. Nix*, 897 F.2d 356 (8th Cir. 1990)
*Nash v. Black*, 781 F.2d 665 (8th Cir. 1986)

Dated this **19** day of August, 2009

BY THE COURT:

John E. Simko
United States Magistrate Judge